# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs March 26, 2014

## STATE OF TENNESSEE v. GEVON CORTEZ PATTON

**Appeal from the Criminal Court for Hamblen County**
**No. 08CR425      John F. Dugger, Jr., Judge**

---

**No. E2013-01355-CCA-R3-CD-FILED-APRIL 16, 2014**

---

A Hamblen County jury convicted Gevon Cortez Patton of especially aggravated kidnapping and criminally negligent homicide. The trial court sentenced him to an effective sentence of twenty-five years in the Tennessee Department of Correction. On appeal, appellant argues that the evidence was insufficient to support his convictions, that the trial court erred in admitting into evidence the transcript of appellant's juvenile court transfer hearing, that the trial court erred by forcing appellant's brother to testify and then declaring him unavailable when he refused to testify, that the trial court erred by admitting an exhibit into evidence when the State had not proven the chain of custody, and that the trial court erred in its sentencing of appellant. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and JEFFREY S. BIVINS, JJ., joined.

John S. Anderson, Rogersville, Tennessee, for the appellant, Gevon Cortez Patton.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; C. Berkeley Bell, Jr., District Attorney General; and Victor Vaughn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts

This case concerns the January 19, 2008 kidnapping and subsequent death of the victim, Willie Morgan. Appellant was indicted for especially aggravated kidnapping and first degree felony murder. At trial, the State's theory was that appellant was a part of a

group of individuals who kidnapped the victim and held him for ransom. The group targeted the victim due to his relationship with Donnie Johnson, who the group believed was responsible for robbing one of its members. The group bound the victim to a chair, and the bindings caused the victim to asphyxiate, leading to his death.

The State's first witness at trial was Hamblen County Sheriff's Department Detective David Stapleton. Detective Stapleton testified that he received information on January 19, 2008, that the victim might have been kidnapped. His investigation led him first to Sonny Mills's residence and then to Roy Hollifield's residence. The victim was not found at either location, but Detective Stapleton learned that appellant, appellant's brother Anthony Patton, and Darryl Nance had been to Mr. Hollifield's residence earlier. Mr. Hollifield reported that they were looking for his brother, Donnie Johnson. Detective Stapleton testified that during the investigation, Nancy McCann Reed called 9-1-1 and told the operator that she had received a telephone call from one of the kidnappers. Detective Stapleton said that the investigators returned to Mr. Mills's residence, where they learned that the kidnappers might be in Bryce Whaley's red Jeep Cherokee. They were unable to locate Mr. Whaley initially but later discovered him at Mr. Mills's residence. Mr. Whaley was taken into custody. While investigators were questioning Mr. Whaley, Mr. Whaley received at least one telephone call from a Chattanooga number. Subsequently, the sheriff's department contacted the Chattanooga Police Department and asked them to be on the lookout for vehicles with Hamblen County license plates at local motels. Eventually, the Chattanooga Police Department located Darryl Nance, Jessica Lane, Betty Fuson, and Whitney Webb, all of whom were taken into custody. From interviews with these individuals, Detective Stapleton learned of the involvement of appellant and appellant's brother in the victim's kidnapping. Detective Stapleton testified that Mr. Whaley led the investigators to the victim's body. The victim had been hidden in a pile of brush, and his left hand had been severed. The investigators received information that the kidnappers had restrained the victim at Ms. Fuson's trailer.

Nancy McCann Reed testified that the victim was "like a dad" to her. She stated that she received a telephone call from Jessica Nicole Lawson[1] informing her "that the black boys that [her] nephew Donnie Johnson robbed had either shot [the victim] or kidnapped him." Ms. Reed relayed this information to the 9-1-1 operator, and the State played the recording of her 9-1-1 call to the jury.

Roy Hollifield testified that Donnie Johnson was his brother. They considered the victim to be their grandfather, although they were not actually related. Mr. Hollifield

---

[1] Ms. Lawson was deceased at the time of trial; however, the State read into evidence her testimony from a hearing in juvenile court. That testimony is not included in the appellate record.

recalled receiving a visit from Darryl Nance and one of the Patton brothers (he could not recall whether Anthony or appellant came with Mr. Nance) on the day prior to the victim's kidnapping. Mr. Nance informed him that he was looking for Mr. Johnson. Mr. Hollifield did not know where Mr. Johnson was, but he tried to call him. Mr. Nance told Mr. Hollifield to let Mr. Johnson know that he was looking for him. The following day, the day of the victim's kidnapping, Mr. Nance and both Patton brothers visited Mr. Hollifield. This time, Mr. Nance displayed a pistol and told Mr. Hollifield that he was going to kill Mr. Johnson when he found him. Mr. Hollifield recalled that the men arrived in a red Jeep. On cross-examination, Mr. Hollifield testified that appellant was either fifteen or sixteen years old in January 2008.

Daniel Kuykendall testified that he had been in a relationship with Jessica Lane in January 2008. He recalled seeing Ms. Lane with Mr. Nance, Mr. Whaley, and two black men in a red Jeep Cherokee on January 19, 2008. He testified that they came to his trailer in Ball's Trailer Park and that Ms. Lane borrowed his cellular telephone. Ms. Lane gave the telephone to Mr. Nance, and Mr. Kuykendall retrieved it from him. Mr. Kuykendall testified that before she left, Ms. Lane "said she had to take care of some business."

Erica Lawson testified that she saw Ms. Lane and Mr. Nance with both Patton brothers at Sonny Mills's residence on one evening in January 2008. She could not recall the exact date, but she said it was between 9:30 and 10:00 p.m. She remembered that they were eating a meal from Hardee's.

Whitney Webb testified that she and Betty Fuson spent much of January 19, 2008, shopping. Ms. Webb was driving them in her white Mustang. When they returned to Ms. Fuson's trailer, Ms. Fuson was unable to open the door, so they drove away. When they left, they saw Darryl Nance and Jessica Lane by a red Jeep. Mr. Nance told them that they had run out of gas and asked Ms. Webb to get gas for them. He also told her that he would give her money for the gas if they would all go to Ms. Fuson's trailer. In the trailer, Ms. Webb testified that she observed the victim tied to a chair in the living room. She said that appellant was not in the living room but that she saw him later in Ms. Fuson's bedroom. Ms. Webb testified that when she tried to leave, Mr. Nance refused to let her go. However, Mr. Nance changed his mind when appellant volunteered to go with her and Ms. Fuson to ensure that the women returned. Ms. Webb, Ms. Fuson, and appellant went to the Food City in White Pine. They bought a container and filled it with gas. They drove back to the red Jeep and left the gas inside it. Appellant then accompanied the women to Morristown and Knoxville. Ms. Webb testified that appellant told her Mr. Nance and Anthony Patton kidnapped the victim while he and Ms. Lane waited in the vehicle. On cross-examination, Ms. Webb said that the victim was alive when they left the trailer.

Betty Fuson testified that in January 2008, she did not have a key to her trailer but that Darryl Nance and his brother had keys. She said that her trailer was on the border between Jefferson County and Hamblen County. Ms. Fuson recalled that she and Ms. Webb had been shopping on January 19, 2008, before they went to her trailer to get clothes for a trip to Knoxville. When they arrived at her trailer, both doors were locked. They decided to go to Knoxville anyway, but they stopped when they saw Mr. Nance and Ms. Lane with a red Jeep near her trailer. Mr. Nance told her that he "had Donnie's papaw tied up at [her] house." She did not believe him at first, but when she entered her trailer, she saw the victim tied to a chair in her living room. Ms. Fuson said that she also saw the Patton brothers in the trailer. She testified that appellant followed her to her bedroom and told her that he was going to go with her when she left. Ms. Fuson stated that Mr. Nance would not let them leave until she called his brother. Mr. Nance's brother convinced him to let Ms. Webb and Ms. Fuson leave to get gas and to let appellant go with them. They left, bought gas, returned to the red Jeep, and left the gas in the Jeep. Ms. Fuson called Mr. Nance to let him know that they had bought the gas and that they were not returning to the trailer. Appellant accompanied her and Ms. Webb to Knoxville. Ms. Fuson said that appellant told her that he and Ms. Lane had waited in the car while Mr. Nance and Anthony Patton went inside the victim's residence. He also told her that he had heard a gun shot while they were inside.

Ms. Fuson testified that Mr. Nance called her when she was in Knoxville, asking for a ride out of town. She and Ms. Webb went to White Pine to pick up Mr. Nance and Ms. Lane and then returned to Knoxville. When Mr. Nance saw appellant in Knoxville, he was angry that appellant had not brought the women back to the trailer. Appellant stayed in Knoxville while Ms. Webb, Ms. Fuson, Ms. Lane, and Mr. Nance drove to Chattanooga. On cross-examination, Ms. Fuson testified that the victim was alive when they left her trailer.

The State called Anthony Patton as a witness; however, he refused to answer any questions substantively, other than declaring appellant's innocence. The trial court ruled that he was unavailable as a witness and allowed the State to read into evidence a statement given by Anthony Patton to investigators on February 22, 2008. Anthony Patton explained to investigators the events leading to the victim's kidnapping.[2] He said that he was with Darryl

---

[2] A version of Anthony Patton's statement that was redacted to exclude any mention of appellant was read to the jury. A copy of the statement was admitted into evidence as Exhibit 17R. The appellate record contains an Exhibit 17, which is Anthony Patton's original, unredacted statement. In his original statement, Anthony Patton mentioned appellant's involvement several times. Thus, admission of the unredacted statement would have been in violation of *Bruton v. United States*, 391 U.S. 123 (1968) (proscribing the use of a co-defendant's statement to implicate a non-confessing defendant as violative of the defendant's right to confrontation). However, appellant did not raise this issue in the trial court or on appeal, and we decline to review it for plain error. One requirement for plain error review is that the record

(continued...)

Nance and Jessica Lane at Sonny Mills's residence, and Mr. Nance repeatedly stated that "he was going to F up Donnie." Anthony Patton left the Mills residence with Bryce Whaley, Mr. Nance, and Ms. Lane in Mr. Whaley's Jeep. He said that they went to Roy Hollifield's and that everyone went inside. Mr. Nance insisted that Mr. Hollifield call his brother, but Mr. Johnson would not answer his telephone. The group left and went to Ball's Trailer Park and then returned to Mr. Mills's residence. Ms. Lane commented that Mr. Johnson was close to the victim. As the group drove around town looking for Mr. Johnson, Ms. Lane suggested that they go to the victim's house, and she drove them there. They all went inside the victim's house when he opened the door. Mr. Nance repeatedly asked the victim for Mr. Johnson's location. Mr. Nance fired his gun at one point. Anthony Patton stated that he and Mr. Nance picked up the victim by his arms and carried him to the vehicle. They took the victim to Betty Fuson's trailer, where someone tied him to a chair. Anthony Patton said that Mr. Nance and Ms. Lane kept asking the victim for Mr. Johnson's location, and Mr. Nance hit the victim in the head with his pistol. At some point, Ms. Lane used Anthony Patton's telephone to leave someone a message informing that person that the group was holding the victim. Ms. Lane suggested that the group return to the victim's house, so they left Ms. Fuson's trailer in the Jeep but very shortly ran out of gas. Anthony Patton said that he was walking back to the trailer when he saw a white Mustang stop by the Jeep. Anthony Patton stated that Mr. Nance told him Ms. Fuson was going to get gas for them. Ms. Fuson and Ms. Webb entered the trailer and went to the bedroom to pack clothes. Anthony Patton said that he saw Mr. Nance hit the victim with his pistol again but harder than the first time. Ms. Fuson and Ms. Webb left to buy gas, and Anthony Patton later received a text message indicating that they had left the gas in the Jeep. Eventually, Anthony Patton left with Mr. Nance and Ms. Lane. They ordered food from Hardee's and went to Mr. Mills's residence.

In addition to the eyewitness testimony, the State presented forensic evidence tending to show that the victim had been in Ms. Fuson's trailer and Mr. Whaley's Jeep. The victim's severed hand was found inside Mr. Whaley's Jeep, along with two knives. The victim's blood was located in various areas in the Jeep and on one of the knives. The victim's DNA was also found on suspenders collected from Ms. Fuson's bathroom. A forensic examiner from the Federal Bureau of Investigation ("FBI") compared hair from the chair in Ms. Fuson's living room to a known sample of the victim's hair and concluded that the two had the same microscopic characteristics. Another FBI forensic examiner compared mitochondrial DNA from the two hair samples and concluded that they matched at every

[2](...continued)
must clearly indicate what occurred in the trial court. *State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000). The record before this court does not reveal whether the jury ever saw the unredacted statement. Therefore, plain error review is inappropriate in this case. *See* Tenn. R. App. P. 36(b).

position, meaning that the examiner could not exclude the victim as the source of the hair found on the chair.

Medical Examiner Dr. Darinka Mileusnic-Polchan testified as an expert in forensic pathology. She stated that the cause of the victim's death was restraint asphyxiation, caused by the bandana that had been wrapped around his jaw and neck. She explained that the restraint pushed the victim's tongue up and prevented him from breathing efficiently. Dr. Mileusnic-Polchan opined that the extent and distribution of hemorrhaging in the victim's muscles were "consistent with strangulation or pressure more than just a simple knot on the front of the neck [could have] produce[d]." She further opined that based on the rigidity of the body when it was found, the victim was in a seated position for at least six hours after his death. She noted that the victim had not eaten within six hours of his death and had not been receiving adequate fluids for up to a day prior to his death. Dr. Mileusnic-Polchan testified that the victim's advanced age and dehydration contributed to his death. She further testified that the victim's left hand was severed after his death, a conclusion she reached due to the lack of bruising and minimal bleeding. She stated that the victim's autopsy also showed that he received blunt force trauma to his head. When asked whether she could determine if the victim was tortured, she replied, "[S]itting in a chair and being tied to a chair, it's already a torture. As far as being tied and being hit in the head is just, obviously, not a gentle handling."

Following Dr. Mileusnic-Polchan's testimony, the State rested its case. Appellant presented no proof. The jury found appellant guilty of especially aggravated kidnapping and the lesser-included offense of criminally negligent homicide. The trial court sentenced appellant to twenty-five years as a violent offender for especially aggravated kidnapping and to a concurrent sentence of two years as a standard offender for criminally negligent homicide. The trial court denied appellant's motion for new trial, and this appeal follows.

## II. Analysis

### A. Sufficiency of the Evidence

Appellant argues that the evidence was insufficient to support his conviction for especially aggravated kidnapping because he abandoned the common scheme of his co-defendants at his first opportunity. He further argues that the evidence was insufficient to support his conviction for criminally negligent homicide because he did not commit a reckless or negligent act. The State responds that the evidence was sufficient to support both of appellant's convictions.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

As charged in the indictment in this case, especially aggravated kidnapping is "knowingly remov[ing] or confin[ing] another unlawfully so as to interfere substantially with the other's liberty" and doing so to hold the victim for ransom. Tenn. Code Ann. §§ 39-13-302, -305. Criminally negligent homicide is defined as "[c]riminally negligent conduct that results in death." *Id.* § 39-13-212(a). The statute defining criminal negligence states:

> [A] person . . . acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that

the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

*Id.* § 39-11-106(a)(4).

The State pursued a theory that appellant was criminally responsible for the actions of the rest of the group who kidnapped the victim. "A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Further, a person is criminally responsible for an offense committed by the conduct of another, if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" *Id*. § 39-11-402(2). While not a separate crime, criminal responsibility is a theory by which the State may alternatively establish guilt based on the conduct of another. *Dorantes*, 331 S.W.3d at 386 (citing *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)). No specific act or deed needs to be demonstrated by the State, and furthermore, the presence and companionship of an accused with the offender before and after the offense are circumstances from which participation in the crime may be inferred. *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). However, to be convicted, "the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386 (citing *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994)); *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)).

Viewed in the light most favorable to the State, the evidence adduced at trial revealed that appellant accompanied Anthony Patton, Jessica Lane, and Darryl Nance as they forcibly took the victim from his home and held him at Betty Fuson's trailer. According to the testimony presented at trial, the purpose of kidnapping the victim was to place pressure on Donnie Johnson, who had a close relationship with the victim. To further their purpose, Jessica Lane called someone to inform that person that the group was holding the victim. There was also testimony presented that the group pressured the victim to give them money. Multiple witnesses testified that appellant was with the group that kidnapped the victim on the day of the kidnapping. Furthermore, appellant was seen inside Betty Fuson's trailer. Based on this evidence, any rational juror could have found appellant guilty beyond a reasonable doubt of especially aggravated kidnapping on a theory of criminal responsibility. Moreover, appellant's claim that he abandoned the kidnapping and thus should not be responsible for it is without merit because the offense was complete before he left the group.

As for his criminally negligent homicide conviction, the medical proof showed that the bindings used around the victim's head while he was being held in Ms. Fuson's trailer led to his death and that the victim's advanced age and dehydration contributed to his death. Any ordinary person should have been aware that there was a substantial and unjustifiable risk of death when kidnapping a person of the victim's age and health, binding him to a chair for hours, and tying a restraint around his neck. In addition, the facts and circumstances supporting appellant's criminal responsibility for especially aggravated kidnapping apply equally to his conviction for criminally negligent homicide. Therefore, we conclude that appellant is without relief as to this issue.

### B. Introduction of Juvenile Court Transfer Hearing Transcript

For the first time on appeal, appellant contends that the trial court should not have admitted the transcript of appellant's juvenile court transfer hearing — apparently referring to the transcript of Jessica Lawson's testimony that was read into evidence due to her unavailability — into evidence because the transfer hearing was not properly conducted. At trial, appellant objected to the introduction of the transcript but on the basis of a violation of the Confrontation Clause. "It is well-settled that an appellant is bound by the evidentiary theory set forth at trial, and may not change theories on appeal." *State v. Alder*, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001). Therefore, appellant has waived review of this issue.

### C. Testimony of Anthony Patton (Appellant's Issues III & IV)

Appellant argues that the trial court erred by "forcing" Anthony Patton to testify, by declaring Anthony Patton to be unavailable to testify under Tennessee Rule of Criminal Procedure 15, and by failing to grant a mistrial based on Anthony Patton's behavior in the courtroom. The State responds that Anthony Patton refused to testify and that appellant has not shown prejudice based on Anthony Patton's behavior.

Regarding the trial court "forcing" Anthony Patton to testify, appellant contends that Anthony Patton was not under subpoena to testify and should not have been forced to the witness stand. In support of this contention, he claims that "[t]here was no return of service of the subpoena to testify in the file." However, the record is inadequate for this court to review appellant's claim as no subpoena is included in the appellate record. Moreover, appellant has not presented this court with any authority stating that a lack of return of service of process for a subpoena to testify would render a witness's testimony inadmissible. Nonetheless, Anthony Patton effectively refused to testify, and the trial court declared him unavailable under Tennessee Rule of Criminal Procedure 15. Thus, appellant's claim that Anthony Patton was "forced" to testify is without merit.

Regarding appellant's motion for mistrial premised on Anthony Patton's behavior in the courtroom, the record shows that Anthony Patton used an inordinate amount of profanity both in and out of the presence of the jury. His actual appearance and demeanor are, of course, not reflected in the transcript. The only substantive comment made by Anthony Patton was a declaration of appellant's innocence. Appellant claims that Anthony Patton's behavior "had to have unduly influenced [and] prejudiced" him.

A trial court may declare a mistrial if it appears that some matter has occurred which would prevent the jury from reaching an impartial verdict. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). A trial court should only declare a mistrial in criminal cases where a manifest necessity requires such action. *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). A mistrial is appropriate when a trial cannot continue or a miscarriage of justice would result if it did continue. *State v. McPherson*, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). This court will review the trial court's decision to grant or deny a mistrial for abuse of discretion. *See State v. Hall*, 976 S.W.2d 121, 147 (Tenn. 1998) (citing *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990)). The party requesting the mistrial bears the burden of establishing the necessity for it. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

Here, appellant has not established the necessity for a mistrial. While Anthony Patton's behavior may not have reflected positively on his *own* character, appellant has failed to show how his brother's behavior prevented the jury from reaching an impartial verdict against *appellant*. Again, the only substantive comment made by Anthony Patton was that appellant was innocent. Moreover, the trial court was in a far superior position than this court to determine the extent of prejudice caused by Anthony Patton's behavior. "[A]n appellate court should find an abuse of discretion when it appears that a trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997) (citing *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996)). There is no indication of an abuse of discretion in this case.

Finally, appellant contends that the trial court erred in declaring appellant's brother unavailable to testify under Tennessee Rule of Criminal Procedure 15 when the State did not satisfy the requirements of "unavailability." Initially, we note that appellant has not cited the appropriate rule for what occurred in the trial court. Tennessee Rule of Criminal Procedure 15 addresses depositions, but the statement by Anthony Patton introduced at trial was not a deposition. Instead, it was a statement against interest, which is inadmissible hearsay unless

the declarant is ruled to be unavailable. Tenn. R. Evid. 804(a), (b). Therefore, the issue falls under the hearsay rule.[3]

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay is not admissible at trial unless it falls within an exception to the exclusionary rule. Tenn. R. Evid. 802. We are aware of the disagreement among panels of this court regarding the appropriate standard of review of the admissibility of hearsay evidence;[4] however, for purposes of this case, the result is the same whether reviewed for abuse of discretion or de novo.

Under Evidence Rule 804(a)(2), one occasion for declaring a witness to be unavailable is if he or she "[p]ersists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so[.]" When a witness is thus unavailable, Rule 804(b) allows the admission of a statement made by the witness against his or her interest.[5] In this case, the trial court ordered Anthony Patton to testify while he was on the stand. Anthony Patton refused to testify, repeatedly and vociferously. The court then declared him unavailable. The State read his statement to police into evidence. The court gave appellant an opportunity to cross-examine, but he explicitly waived his right to do so. Based on the record before us, we conclude that Anthony Patton's behavior meets the

---

[3] In addition, we note that Anthony Patton did not invoke his Fifth Amendment right to remain silent before the jury.

[4] *See State v. Dotson*, 254 S.W.3d 378, 392 (Tenn. 2008) (in considering an issue involving hearsay, holding that "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record"); *Pylant v. State*, 263 S.W.3d 864, 871 n.26 (Tenn. 2008) (maintaining that the standard of review for hearsay issues is abuse of discretion); *Willie Perry, Jr. v. State*, No. W2011-01818-CCA-R3-PC, 2012 WL 2849510, at *3 (Tenn. Crim. App. July 11, 2012) (stating that standard of review for admissibility of evidence is abuse of discretion). *But see State v. Gilley*, 297 S.W.3d 739, 760 (Tenn. Crim. App. 2008) (stating that whether a statement is offered to prove the truth of the matter asserted is "necessarily a question of law" and is not subject to review under abuse of discretion standard); *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007) (holding that appellate review of hearsay issues is de novo with no presumption of correctness); *Willie Perry, Jr.,* 2012 WL 2849510, at *7 (Bivins, J., concurring) (applying de novo standard of review to hearsay issues).

[5] Tennessee Rule of Evidence 804(b)(3) defines a statement against interest as:

A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

circumstances required for unavailability under Rule 804(a)(2). Therefore, appellant is without relief as to this issue.

## D. Chain of Custody

Appellant contends that the trial court erred by admitting Exhibit 37 (a piece of a shoestring) when the State did not sufficiently establish the chain of custody. Specifically, he contests the chain of custody because the medical examiner's investigator, Larry Vineyard, handled the exhibit but did not testify at trial. The State responds that it established the chain of custody.

The determination of whether the State has properly established the chain of custody of evidence is a matter left to the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *See State v. Cannon*, 254 S.W.3d 287, 295 (Tenn. 2008). Generally, "[a] trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010). Tennessee Rule of Evidence 901(a) provides: "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." As our supreme court has held, "'[A]s a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody.'" *Cannon*, 254 S.W.3d at 296 (quoting *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000)). "The purpose of the chain of custody is to 'demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" *Scott*, 33 S.W.3d at 760 (quoting *State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)). The State should sufficiently prove each link in the chain of custody, but the State is not required to prove the identity of tangible evidence beyond all possibility of doubt nor must it exclude every possibility of tampering. *Cannon*, 254 S.W.3d at 296. In addition, the State's failure to call as a witness each person who handled an item does not necessarily preclude the admission of the evidence. *Id.* "Accordingly, when the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." *Id.* The trial court should not admit an item into evidence if the State fails to provide sufficient proof of the chain of custody, unless the identity and integrity of the item can be established by other means. *Id.*

In this case, Dr. Mileusnic-Polchan testified that she removed the shoestring from the victim's body, placed it in a bag, sealed the bag, and gave it to Larry Vineyard. Detective Hayes testified that he received the shoestring from Larry Vineyard in a sealed bag. Thus,

there were no unidentified links in the chain of custody, despite Larry Vineyard's not testifying.  Again, the State's failure to call as a witness every person who handled evidence does not preclude the evidence's admissibility.  *Id.*  Based on the record before us, we conclude that the trial court did not abuse its discretion in ruling that the State sufficiently established the chain of custody.

### D.  Sentencing

Appellant contests the length of his sentence.  Specifically, he argues that the trial court erred by failing to consider certain mitigating factors.  However, he has failed to include a transcript of the sentencing hearing.  Appellant received within-range sentences of twenty-five years for especially aggravated kidnapping and two years for criminally negligent homicide.  Typically, when an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness.  *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012).  This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. However, in this case, appellant has not provided this court with an adequate record to review the trial court's sentencing decision.  Appellants are charged with preparing a record that is adequate to convey a complete account of the issues underlying their appeals, and failure to provide a complete record of the proceedings relevant to the appellate issues precludes review.  Tenn. R. App. P. 24; *State v. Ballard*, 855 S.W.2d 557, 560-61 (Tenn. 1993).  Therefore, appellant has waived this issue.

### CONCLUSION

Based on the record, the briefs of the parties, and the applicable law, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE